UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DEMETTRESS ARLENE BURNETT,      Case No. 1:10-cv-505

    Plaintiff,      Spiegel, J.
     Bowman, M.J.

v.

SELECT SPECIALTY HOSPITAL, et al.,

    Defendants.

**REPORT AND RECOMMENDATION**

Plaintiff Demettress Burnett, proceeding *pro se* and *in forma pauperis,* brings this action against her former employer, alleging that Defendant discriminated against her on the basis of her race. (*See* Docs. 3, 8).[1] Pursuant to local practice, this matter has been referred to the undersigned magistrate judge for a report and recommendation on the Defendant's motion for summary judgment. (Doc. 31). For the reasons set forth herein, I recommend that Defendant's motion be **GRANTED** and that this case be dismissed.

**I. Background**

Plaintiff, who is black, worked as a nurse for Select Specialty Hospital from April 2008 until August 15, 2009. In October 2008, at Plaintiff's request, she began to work part-time, or "PRN" at Select. From the time she began working PRN until her

---

[1] Plaintiff filed an amended complaint in January 2011 which did not significantly differ from her original complaint, other than adding a claim for monetary damages in the amount of $150,000.00. (Doc. 8).

1

resignation, Plaintiff worked, on average, less than once a week. (Doc. 30, Deposition at 144).

Throughout her course of employment, Plaintiff received a good performance review and raises. She was never disciplined. However, Plaintiff generally alleges that she was subjected to less favorable terms and conditions than white employees, and was "harassed by Caucasian staff members and had staff members (Caucasian) who were frequently insubordinate towards [her]." (Doc. 3 at 2). In addition, Plaintiff alleges that she "made several attempts to rectify" the situation by writing to the administration, but no action was taken. (*Id.*). Construing Plaintiff's *pro se* allegations liberally, it appears that Plaintiff claims that the intensity of the disparate treatment/discrimination against her was so pervasive that it led to her constructive discharge. She alleges that she "felt it necessary to resign in order to protect [herself] from further harassment and or retaliation." (Docs. 3, 8).

Prior to initiating suit in this Court, Plaintiff exhausted her administrative remedies by filing a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant discriminated against her by assigning more patients to her than Defendant assigned to Caucasian employees. Plaintiff's EEOC charge alleges that black employees "receive heavier work loads" and "more severe disciplinary actions" than Caucasian employees. (Doc. 3-1 at 2). On April 28, 2010, the EEOC dismissed Plaintiff's charge on the grounds that "assignments were evenly distributed based on the number of patients, patient illness severity, and regardless of the employee's race." (Doc. 3-1 at 3). The EEOC review additionally concluded that "there [was] no evidence that [Plaintiff] was harassed based on [Plaintiff's race]." (*Id.*). Following its guidelines,

2

the EEOC notified Plaintiff of her right to sue Defendant within ninety days of Plaintiff's receipt of the EEOC's findings. (*Id.*).

Attached to Plaintiff's complaint are several documents, including an email from Plaintiff to the CEO of Defendant Hospital dated July 7, 2009, that outlines two alleged incidents of racially-motivated discrimination that occurred the prior week, on July 2 and July 4, 2009. (Doc 3-1 at 10-11). In the first incident on July 2, Plaintiff alleges that she was assigned three severely ill patients, had to cover an LPN, and was assigned a new admission. (Doc. 3-1 at 10). Plaintiff believed that a Caucasian nurse should have been assigned the new admission prior to Plaintiff. Based upon her workload, Plaintiff complains that she was unable to take a bathroom break until 1:30 p.m., and was not provided a standard fifteen minute break or lunch until she spoke to a supervisor. (*Id.*).

Similarly, on July 4, Plaintiff alleges that she was given five difficult patients, one in whom had a reputation for "get[ting] nurses into trouble for not meeting all of his needs right away." (*Id.* at 11). The charge nurse complained that the referenced patient had been asking for pain medication and that Plaintiff was not answering her phone. The charge nurse called Plaintiff on two occasions and threatened to write her up, but did not actually write her up or impose any discipline. Plaintiff contends that the charge nurse misinterpreted the patient's complaint, informing Plaintiff that the patient was upset about his lack of pain medicine, when in fact the patient was upset about a different issue. (*Id.*).

On July 9, two days after receiving Plaintiff's email, Defendant's CEO, Sal Iweimrin, called a meeting with Plaintiff to discuss her concerns. (Doc. 31-1 at 2). Also present at the meeting was Defendant's human resources manager, Kelly Trueman.

3

(*Id.*).  After the meeting, Ms. Trueman and Mr. Iweimrin investigated the staffing assignments of July 2 and July 4, 2009, but concluded that Plaintiff's complaints were unfounded and that the assignments were equitable.  (*Id.* at 4).  On August 12, 2009, Ms. Trueman and Mr. Iweimrin met again with Plaintiff to discuss their conclusion that no racial disparity in staffing assignments had occurred.  Plaintiff complained that the investigation was inadequate and disagreed with their conclusion.  Plaintiff provided Mr. Iweimrin with additional documents for review, and alleged that she had experienced difficulties in the past with the prior CEO, a former charge nurse, and a former Chief Nursing Officer, none of whom were then still employed by Defendant.  Mr. Iweimrin agreed to investigate further, but Plaintiff resigned three days after the August 12 meeting. Nevertheless, Mr. Iweimrin reviewed patient assignments from January through August 2009, again finding no evidence of racial bias or discrimination.  (Doc. 31-1 at 5).  After Plaintiff's resignation, Mr. Iweimrin also spoke to "some" minority employees, who did not share Plaintiff's concerns.  Last, he scheduled diversity training. (Doc. 31 at 4-5).

On April 12, 2012, Defendant filed a motion seeking summary judgment on Plaintiff's claims in this Court, arguing that Plaintiff cannot establish a hostile work environment. (Doc. 31 at 5).  Defendant points out that Plaintiff testified that she never heard any racially inappropriate comments and has no direct evidence of "racial animus."   (Doc. 30, at 10, 69, 70, 143).  In addition, Defendant argues that Plaintiff suffered no adverse employment action because Defendant did not "deliberately create intolerable working conditions, as perceived by a reasonable person" and Plaintiff's

resignation was not "a foreseeable consequence of [Defendant's] actions." (Doc. 31 at 7-8).

In response, Plaintiff asserts that "racial discrimination ha[s] been stated and documented several times to the administrative staff with no preventative measures taken by Select Specialty Hospital." (Doc. 32 at 1). Plaintiff claims that she "was forced to resign because of the lack of concern and lack of measures taken by the administration to assure that minority staff/African American staff were treated equally. (*Id.* at 3). Plaintiff contends that Defendant's evidence should not be believed, because posted assignments remained subject to change, and actual staffing assignments "reveal racial bias." (*Id.* at 4).

For the reasons that follow, I find Defendant's motion to be persuasive, and recommend that the motion be granted.

## II. Analysis

### A. Summary Judgment Standard

In a motion for summary judgment, a court "must view the facts and any inferences that can be drawn from those facts ... in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed.R.Civ.P. 56©) (internal quotation marks omitted). "Weighing of the evidence or making credibility

determinations are prohibited at summary judgment-rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

### B. Defendant's Motion

To establish a claim of discrimination, plaintiffs may produce either direct or circumstantial evidence. Plaintiff testified that she never heard anyone say anything racially offensive or inappropriate, and offers no evidence of direct discrimination. Instead, Plaintiff relies solely on indirect or circumstantial evidence of discrimination. The familiar McDonnell Douglas burden-shirting framework applies to cases involving indirect evidence of racial discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Regardless of whether a plaintiff seeks to prove her case by direct or indirect evidence, summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In this case, Plaintiff generally alleges race discrimination. (Docs. 3, 8). As Defendant notes, the complaint is ambiguous to the extent that Plaintiff's allegations suggest racial harassment (hostile work environment), discrimination, and possibly retaliation. In its motion for summary judgment, Defendant has met its burden to show that Plaintiff cannot establish an essential element of any of her possible claims.

### 1. Harassment/ Hostile Work Environment

To prove a racially hostile work environment, "a plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably

6

interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009)(citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). Defendant is entitled to judgment as a matter of law for any claim of a hostile work environment, based upon Plaintiff's inability to show the second, third, or fourth elements of her claim.

In other words, Plaintiff cannot show that she was subjected to racial "harassment" that was sufficiently severe and pervasive to interfere with her work environment. *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). There is no evidence of racially inappropriate comments, and no other evidence of severe or pervasive racially-motivated conduct. Plaintiff complains generally of an alleged disparity in discipline and work assignments. However, she offers no evidence that she was ever subjected to discipline (as opposed to merely threatened with discipline during one shift). As to work assignments, Plaintiff's complaint focuses on two discrete shifts, on July 2 and July 4, 2009. However, Defendant has submitted strong evidence, in the form of Mr. Iweimrin's affidavit concerning his analysis and conclusions, as well as staffing assignment data, that reflects that Caucasian employees were not treated more favorably on those two days or, on average, over the months leading up to those days.

In response, Plaintiff cites work assignment sheets from 15 separate days between August 7, 2008 and July 9, 2009. However, Plaintiff has not rebutted Defendant's evidence at all concerning July 2 and July 4, 2009 (the primary focus of her complaint), and the limited evidence she offers of heavier assignments on certain days

7

selected over a year's time is insufficient to establish a claim of severe or pervasive racial bias, amounting to a hostile work environment. *See, e.g., Williams v. CSX Transp. Co., Inc.,* 643 F.3d at 512 (holding that isolated incidents will not suffice to prove sufficiently severe or pervasive race-based harassment); *Hall v. Branham*, 2012 WL 931040 (D.S.C. March 19, 2012)(rejecting minority nurse's similar claim of harassment based upon patient assignments, in light of assignment sheets and affidavit of Director of Inpatient Nursing that did not show racial harassment that was objectively severe or pervasive.).  As Defendant points out in its reply memorandum, most of the records submitted by Plaintiff reflect no significant difference in the assignment of patients between Plaintiff and other nurses.  While a small number of records reflect that Plaintiff had heavier work assignments than some nurses on some days (though she never had the greatest number of patients), those schedules predate Plaintiff's resignation by many months, occurred under different supervisors and a different CEO, and are arguably time-barred because the allegedly discriminatory assignments occurred more than 300 days prior to the date she filed her EEOC charge.  *See* 42 U.S.C. §2000e-5(e)(1).

### 2. Discrimination Claim

In addition to Plaintiff's failure to demonstrate any evidence of racially-motivated conduct by the Defendant, much less conduct that was sufficiently severe and pervasive to constitute a hostile work environment, Defendant is entitled to summary judgment because Plaintiff cannot establish any type of racial discrimination absent some type of adverse employment action.  Here, Plaintiff's complaint alleges she was "forced" to resign as a result of her racially hostile environment. The record confirms that Plaintiff

was never disciplined, and was not fired from her position, but resigned. Thus, in order to prove her discrimination claim, Plaintiff must prove that she was "constructively" discharged. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996). To prove constructive discharge, the plaintiff must show that her employer deliberately created "working conditions 'so difficult or unpleasant that a reasonable person would have felt compelled to resign.'" *Id.* at 882 (*quoting Easter v. Jeep Corp.*,750 F.2d 520, 522-23 (6th Cir. 1984)); *see also Goldmeier v. Allstate Ins. Co.,* 337 F.3d 629, 636 (6th Cir. 2003).

Whether a reasonable person feels compelled to resign depends on the particular facts of each case. *See Goldmeier*, 337 F.3d at 636 (holding that all circumstances should be examined, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's performance," internal quotation and additional citation omitted). Here, the record reflects that Plaintiff was never disciplined, never demoted, never received a reduction in salary, never reassigned to menial or degrading work, and was never badgered or humiliated by Defendant in an effort to encourage Plaintiff to resign. Plaintiff's dissatisfaction with her work assignments, and her subjective feelings of being unfairly criticized on July 4 and of being disrespected by co-workers, do not constitute intolerable working conditions that would compel a reasonable person to resign. *Accord Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004); *Utomi v. Cook County*, 2001 WL 914465 (N.D. Ill., Aug. 14, 2001)(granting summary judgment to employer hospital on

9

hostile work environment and discrimination claims by black nurses, based upon lack of adverse employment actions, and insufficiently pervasive or severe conduct).

In short, Defendant has carried its burden of proving that it has not committed the alleged discrimination.  Defendant has provided evidence documenting nursing schedules that show Plaintiff was not given more patients than other Caucasian nurses. (Doc. 30-1 at 46-67).  The EEOC issued a "right to sue" letter only after finding that "assignments were evenly distributed based on the number of patients, patient illness severity, and regardless of the employee's race. . . there [was] no evidence that [Plaintiff] was harassed based on [Plaintiff's race]."  (Doc. 3-1 at 3).  Defendant provided additional evidence reflecting its efforts to address all complaints that Plaintiff brought to its attention.  (Doc. at 7-8).  *Accord Lee v. Eden Medical Center*, 690 F. Supp. 2d 1011 (N.D. Ca., 2010)(where employer investigated and found that minority nurse's patient assignments were typical, plaintiff could not present triable issue of material fact on her claim of harassment based on race).

Plaintiff argues that her claim is supported by an initial determination of the Ohio Office of Unemployment Compensation, dated October 19, 2009, that Plaintiff was entitled to unemployment compensation benefits despite resigning from her position. The determination letter states that "[f]acts establish that the claimant was subjected to unreasonable abuse and/or hardship by working with his/her fellow employees.  The claimant informed the employer of his/her concerns, but the employer failed to correct the situation."  Based upon these alleged facts, the agency issued a preliminary determination that "the claimant quit with just cause." (Doc. 32-1 at 1).  Aside from the fact that the letter on its face reflects that it is a "preliminary" determination, a

determination by the Ohio Department of Jobs and Family Services cannot be given any preclusive effect in a subsequent suit filed under Title VII. *See Murray v. Kaiser Permanente*, 52 Fed. Appx. 725, 727 (6th Cir. 2002).

Defendant argues persuasively that a review of the totality of the allegedly racially-motivated conduct of which Plaintiff complains was not sufficiently severe or pervasive to interfere with Plaintiff's work performance, or to create an environment that a reasonable person would find hostile. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether – taken together – the reported incidents make out such a case." *Williams v. General Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999). Unless extremely serious, isolated incidents of harassment will not amount to actionable changes in the terms or conditions of employment. *See Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 790 (6th Cir. 2000). Title VII was never intended as a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). To prove discrimination in the form of a hostile work environment, a plaintiff must show that:

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment …
> \* \* \* \* \* \*
> Conduct that is not severe or persuasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter,* 59 Fed. App'x 678, 681 (6th Cir. 2003)(quoting *Harris v. Forklift Systems,* Inc., 510 U.S. 17, 21-23 (1993)).

Given this standard, it is clear that neither the two specific incidents outlined in Plaintiff's complaint, nor her more general allegations, rise to the level of objectively severe or pervasive harassment that affected the terms, conditions, or privileges of Plaintiff's employment.  Plaintiff's contention that she was subjected to unfair assignments on two days in July are insufficient to support her claim, because such isolated and sporadic encounters are not sufficiently pervasive or severe so as to support a hostile work environment claim.  Cases involving far more egregious conduct have been held not to create a hostile work environment, even when there is evidence (unlike here) that the conduct was motivated by some discriminatory animus.  *Accord, Bowman v. Shawnee State University*, 220 F.3d 456, 459 (6th Cir. 2000)(female university dean rubbed shoulder of male instructor on one occasion, and on another occasion grabbed his buttocks and said "I control [your] ass."); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997)(conduct over four month period involving repeated sexual jokes insufficiently severe or pervasive); *Clay v. Unite Parcel Service, Inc.*, 501 F.3d 695, 708 (6th Cir. 2007)(fifteen incidents over two year period were not sufficiently severe or pervasive to show racially hostile work environment).

In addition to reviewing the objective facts of which Plaintiff complains, courts will review evidence concerning the employer's intent, and whether the actions taken by the employer were intended to cause the employee to resign.  Plaintiff's claim advances no further by reviewing this element, because she cannot show that her decision to resign was a foreseeable consequence of Defendant's actions.

In response to Defendant's motion, Plaintiff points to her earlier complaints to a prior CEO of Select Specialty Hospital, Damien Jones. On March 10, 2009, Plaintiff wrote a lengthy letter to Mr. Jones that alleged "disrespectful and rude" behaviors - largely by co-workers - that "appear to *possibly* be racially motivated." (Doc. 32-1 at 7, emphasis added). The letter details several conflicts both with a supervisor and with other nursing staff, including a complaint about patient care. The letter also references Plaintiff's decision to reduce her hours to "PRN" hours in October 2008, based upon her belief that her work assignments were "unfair." Relating an incident on October 9, 2008, Plaintiff suggests she was given more work based upon her race, and asserts that a nursing aide co-worker with whom she had a conflict acted as if "because she is white, she takes priority over me regardless of the fact that I am the RN and she is the CNA." (*Id.* at 8). Plaintiff complains of several incidents of insubordination from the same aide, and concludes her letter by asking "Will it ever be addressed or will the insubordination and dare I say racism continue?"

The record does not reflect what, if any, response Mr. Jones made to Plaintiff's March 2009 letter, other than indicating receipt and a promise to follow up. Apparently Mr. Jones subsequently left the employ of the Defendant and Mr. Iweimrin took over as CEO in the late spring or summer of 2009. However, there is no evidence that Plaintiff made any additional complaints between her March 2009 letter to Mr. Jones and her July 2009 letter to Mr. Iweimrin. The July 2009 letter to Mr. Iweimrin did not reiterate Plaintiff's earlier complaints, concerning incidents alleged to have occurred during the fall of 2008. Once Mr. Iweimrin was notified of Plaintiff's July 2009 letter, Defendant took action to investigate and/or resolve them, and was in the midst of an additional

investigation concerning Plaintiff''s last complaint when Plaintiff resigned. (Doc. 31 at 7-8). Thus, the record reflects that Plaintiff did not provide Defendant a reasonable opportunity to address her concerns, and that Plaintiff's resignation was not a foreseeable result of Defendant's actions. Because Plaintiff cannot establish that she was constructively discharged, Defendant's motion for summary judgment should be granted.

Even if Plaintiff could establish severe and pervasive conduct, Defendant would not be liable for the alleged co-worker harassment because it took reasonable steps to investigate and prevent discriminatory harassment from occurring. The Sixth Circuit has explained that "[t]he act of discrimination by the employer in [a hostile work environment case involving coworkers] is not the harassment, but rather the inappropriate response to the charges of harassment." *McCombs v. Meijer, Inc.,* 395 F.3d 346, 353 (6th Cir. 2005)(internal quotation marks and citation omitted). Accordingly, the relevant inquiry is whether Defendant's conduct constituted appropriate remedial action after Defendant was put on notice by Plaintiff of her concerns. An employer will not be let off the hook based upon its "good faith" but instead "may be held liable when its remedial response is merely negligent, no matter how well-intentioned." *See Kasprzak v. DaimlerChrysler Corp.*, 431 F. Supp.2d 771, 776 (N.D. Ohio 2005).

An employer's response will be deemed to be adequate if it is "reasonably calculated to end the harassment." *Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 340 (6th Cir. 2008)(quoting *Jackson v. Quanex Corp.*, 181 F.3d 647, 663-64 (6th Cir. 1999)). On the facts presented, the Defendant's response was neither indifferent nor unreasonable. Although the record is silent as to what actions, if any, Mr. Jones took

prior to his departure in response to Plaintiff's March 2009 letter, upon notification of Plaintiff's new complaints in July 2009, Defendant's new CEO immediately launched an investigation and analyzed data concerning her work assignments. Defendant met with Plaintiff following its initial investigation to discuss its findings and conclusions. When Plaintiff complained about the adequacy of the investigation, Defendant agreed to investigate further, over a longer time period. However, Plaintiff chose to resign rather than to await the results of the expanded investigation.

In her response to Defendant's motion for summary judgment, Plaintiff argues that Defendant's response was facially inadequate because he did not interview other minority employees or schedule diversity training prior to her August 15, 2009 resignation. However, because Defendant's analysis of the data concerning work assignments prior to and including July 2009 revealed no racial disparities, Defendant's initial response was reasonable.

Plaintiff also points to her prior complaints, concerning specific incidents that occurred in the fall of 2008, to the Defendant's prior CEO. However, Plaintiff did not recount the same incidents in her July 2009 letter to Mr. Iweimrin. Therefore, Mr. Iweimrin would have had no reason to believe that Plaintiff's complaints about the "insubordination" of co-workers in the fall of 2008 had not been fully addressed.

### c. Retaliation Claim

Plaintiff alleges that she was forced to resign in order to prevent the Defendant from retaliating against her. While ambiguous, it appears that Plaintiff may be attempting to plead a retaliation claim. Plaintiff did not check the retaliation box on her EEOC charge form, or include any allegations in the narrative portion of her

administrative claim that would put the Defendant on notice of a retaliation claim. She alleges no acts of retaliation, but only that she resigned in order to prevent Defendant from taking any retaliatory action against her. Therefore, to the extent that Plaintiff attempts to raise a retaliation claim, Defendant is entitled to summary judgment because Plaintiff has failed to exhaust her administrative remedies with respect to any such claim. *See Younis v. Pinnacel Airlines, Inc.*, 610 F.3d 359, 362-363 (6th Cir. 2010).

### III. Conclusion and Recommendation

For these reasons, the undersigned hereby **RECOMMENDS** that the Defendant's Motion for Summary Judgment (Doc. 31) be **GRANTED.** Plaintiff's complaint should be dismissed with prejudice, and this case be **CLOSED**.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

DEMETTRESS ARLENE BURNETT,  Case No. 1:10-cv-505

    Plaintiff,  Spiegel, J.
                                                                     Bowman, M.J.

    v.

SELECT SPECIALTY HOSPITAL, et al.,

    Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).